P. R. RAILWAY, LIGHT & POWER Co., Petitioner, *v.* DISTRICT COURT OF HUMACAO, Respondent.

No. 79. Argued December 22, 1941—Decided February 18, 1942.

*Brown, González & Newsom,* and *E. Córdova Díaz* for petitioner. *George A. Malcolm, Attorney General, Pablo Defendini* and *R. García Cintrón; Deputy Attorneys General,* for the People, plaintiff in the main action.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The People of Puerto Rico, represented by Rexford G. Tugwell, Governor of Puerto Rico, Sergio Cuevas Bustamante, Commissioner of the Interior, and George A. Malcolm, Attorney General, instituted in the lower court a condemnation proceeding against the petitioner herein, P. R. Railway, Light & Power Co. Two causes of action were set up in its complaint. In the first it alleged that on January 4, 1928, the defendant obtained a franchise numbered 591, entitled: "An ordinance granting to the Porto Rico Railway, Light & Power Company authority to utilize the water and waterfalls of the Hicaco, Cubuy, Prieto and Sabana Rivers, and their tributaries, which form the so-called 'Blanco' River, in Naguabo, Puerto Rico, and the so-called Río Blanco. Development, and to construct, maintain and operate a hydroelectric plant and the necessary transmission lines to develop and transmit electric current"; that according to the provisions of section 9 of said franchise, the grantee bound itself to convey to The People of Puerto Rico the aforesaid plant, with all its appurtenances, not including the transmission lines at the original cost of said plant and appurtenances, plus the cost of any improvements, less depreciation thereof, all this at the expiration of ten years, counted from the construction and operation of the plant and lines authorized under the franchise, it being the duty of the Commissioner of the Interior to serve notice on the grantee of the intention of The

People of Puerto Rico to effect such purchase one year before the expiration of the aforesaid period of ten years: that on or about August 8, 1938, within the time specified in the franchise, the Commissioner of the Interior served notice on the grantee of the intention of The People of Puerto Rico to take, on September 12, 1939, the aforesaid plant known as "Planta Hidroeléctrica de Río Blanco," its appurtenances and accessories, not including its transmission lines, for the consideration agreed upon in the franchise, which, according to the plaintiff, is the fair and reasonable value of said properties; that accordingly it tendered to the grantee the sum of $871,066.35 as the value of the hydroelectric plant and its appurtenances, not including the transmission lines, and upon the refusal of the defendant, petitioner herein, it instituted through José Enrique Colom, Commissioner of the Interior, a condemnation proceeding, the complaint in said proceedings having been dismissed on September 20, 1941; that on the 4th of October following the plaintiff made a further demand on the grantee to convey to it the property in question and brought the present proceeding in the lower court, and in addition to the above-stated facts it alleged that in the opinion of the Commissioner of the Interior such plant together with its appurtenances became necessary for the development and proper working of the hydroelectric system established and operated by the People of Puerto Rico through the Puerto Rico Water Resources Board, and that, in order to secure the same, said officer had requested the Attorney General of Puerto Rico to institute this proceeding. In the second cause of action the plaintiff reproduced the pertinent allegations contained in the first, and stated further that for the proper development and operation of the said hydroelectric system it became necessary to secure the transmission lines which were built and maintained by the defendant pursuant to franchise No. 591 mentioned in the first cause of action, and which extend from

the Río Blanco hydroelectric plant to a point located near Central Vannina within the municipal district of Río Piedras. Said transmission lines are described in exhibit C, which was attached to the complaint and made a part thereof. It was also alleged that on October 4, 1941, it requested the defendant to sell to it said lines for $60,845, which the plaintiff estimated to be their reasonable value, but the defendant refused. The complaint ended with a prayer for a judgment condemning the Río Blanco hydroelectric plant with all its appurtenances, including therein the transmission lines, as the same are described in exhibits A and C, the compensation not to exceed $871,066.35 for the plant and its appurtenances and $60,845 for the transmission lines and for any other relief that might be proper.

On October 8, 1941, the People of Puerto Rico, represented by the above-mentioned officers, filed in the lower court a document entitled "Declaration of Taking" wherein it stated that it was its intention to acquire, for the public purposes already mentioned, the ownership title to the properties described in the complaint in both causes of action. It exhibited therewith plats of said properties, and deposited two certified checks drawn on The National City Bank of New York, San Juan Branch, to defendant's order, one for $871,066.35 as compensation for the properties mentioned in the first cause of action, and another for $60,845, as compensation for the property involved in the second cause of action. In said document it was also stated that said sums were tendered to be deposited either in the clerk's office or in any other way that the court might direct at the disposal and for the benefit of the defendant; and it was further said:

"It is the opinion of the plaintiff as well as of the affiants, individually and collectively, that the sums of money finally to be ascertained or determined in the present action as compensation for the aforesaid properties shall be within any limit that might and should lawfully be paid as the fair and reasonable value of the properties in question."

The plaintiff also filed a motion for the actual delivery of the aforesaid properties within a period not to exceed fifteen days from the time the order for possession should be served upon the defendant, and on October 8, 1941, the court made an order which, after reciting the proceedings had, ended as follows:

"Therefore, the court hereby declares, adjudges, orders, and decrees:

"(1) That the absolute title of ownership to the properties described in exhibits A, B, and C, which are attached to this order and made part thereof, became vested in The People of Puerto Rico from the time the latter filed the said Declaration of Taking and deposited in the office of the clerk of this court the sums of $871,066.35 and $60,845.00, as above stated;

"(2) That the said properties are condemned and taken for use by the People of Puerto Rico, and that the right to a fair compensation for the properties thus taken and condemned is vested in the defendant herein, Porto Rico Railway, Light & Power Co., and that the amount of said compensation is subject to determination in the present proceeding by a judgment entered in accordance with law;

"(3) That the People of Puerto Rico is now entitled to the possession of the above-described properties which the defendant must actually deliver for all legal purposes to the People of Puerto Rico through its authorized representatives, the Governor of Puerto Rico, the Commissioner of the Interior, and the Attorney General, or to any of them, within a period not to exceed fifteen days, counted from the service of a copy of this order upon the defendant.

"(4) That this case shall remain open for any further order, judgment, or decree that may be required to be issued herein;

"(5) And it is further ordered that the clerk of this court issue the proper writ directing the marshal of the District Court for the Judicial District Court of San Juan to serve notice of this order by delivering a copy thereof to the defendant, and after due service shall have been made, such fact shall be entered in the record of this case."

The defendant, which had not been served with notice of the condemnation proceeding or of the order for possession until October 10, filed on October 16 a lengthy motion in the

lower court, requesting that the said order of October 8, 1941, which directed it to deliver the actual possession of the properties involved in the condemnation proceeding, be set aside, and that such delivery be stayed pending a determination of the motion. We will not reproduce now the grounds set forth in said motion, as we propose to state and discuss them later on when considering and deciding the petition for a writ of prohibition, filed by the defendant, which has given rise to this opinion, and in which the same questions are raised.

The motion of the defendant was denied by an order of October 20, 1941. The lower court held that the questions raised in said motion should be determined when deciding the case on its merits; that Section 5A, added to the Eminent Domain Act by Act No. 2 of 1941 (Session Laws, p. 284), imposes on the court the ministerial duty to order the delivery as soon as the plaintiff complies with the legal requisites, and that if afterwards, upon a decision of the case on the merits, it should appear that the plaintiff was not entitled to the delivery of the property, the defendant could then recover whatever damages might have been caused thereby. However, some doubt occurred to the court as to whether the delivery could be ordered if section 5A were unconstitutional, and it then declared that if the law were clearly unconstitutional, notwithstanding the mandatory terms of section 5A, the plaintiff would not be entitled to the delivery of the properties, but it forthwith stated that the law was not clearly unconstitutional. However, it concluded its decision by saying:

"For the reasons stated, the court now denies the motion to set aside the order for possession and allows its previous order to stand, *unless some additional petition is filed.*" (Italics ours.)

Without waiting for such "additional petition," the court on its own motion amended its order on October 21, 1941, and then said:

"The court ratifies its opinion that almost all the objections raised by the defendant to the order for possession can be subsequently determined within the main action, without such determination being an obstacle or a condition precedent to the issuance of said order. Those objections relate to the sufficiency of the complaint and can be set up by a demurrer to the complaint. However, an objection has been raised which, possibly, could not be subsequently raised, for the same does not arise from the averments of the complaint. Said objection has reference to the constitutionality of section 5A of Act No. 2 of 1941, that is the constitutionality of the immediate taking. Such question could not be covered by a demurrer or answer to the complaint itself and, therefore, this court is now of the opinion that the defendant is entitled to object to the delivery, as a preliminary question, on the ground of its being unconstitutional. However, we now finally conclude that section 5A is constitutional and valid, for the defendant is entitled to a hearing and an opportunity to be heard at a subsequent stage of the proceedings and the delivery can be constitutionally effected prior to such hearing. (See the doctrine laid down in *U. S.* v. *72 Acres of Land,* 37 F. Supp. 297.) As to the constitutional question raised with respect to the title of Act No. 2 of 1941, this court has reached the final conclusion that said title is sufficient and also that from said Act No. 2 and from the pleadings in the present case adequately arises the obligation of The People of Puerto Rico to pay to the plaintiff any compensation that might be finally determined by this court.

"Therefore, this court ratifies its opinion in the sense that the motion to set aside the order for possession must be denied. Let notice of this decision be served."

Such was the stage reached by the proceedings in the lower court when the petitioner applied to this court for the writ of prohibition under consideration. In said petition a recital is made of the proceedings had in the lower court and which have been stated above, and the petitioner sets forth the grounds alleged for setting aside the order for delivery of the properties, which grounds may be summarized as follows: (*a*) lack of legal capacity on the part of the Governor, the Commissioner of the Interior, and the Attorney General of Puerto Rico to institute, in the name of the People of Puerto Rico, the condemnation proceeding; (*b*) incorrectness

of the assertion made by the plaintiff to the effect that the transmission lines referred to in the second cause of action set forth in the complaint were built and maintained under the provisions of franchise No. 591, by virtue of which the Río Blanco electric plant was built and operated; and (c) unconstitutionality of section 5A, added to the Act relating to condemnation proceedings by Act No. 2 of 1941. The petitioner further alleged that unless this court reviewed the decision of the District Court of Humacao on a writ of prohibition or of certiorari, even though the remedy by appeal might be available to the petitioner, it would be deprived of its property without due process of law and would be compelled to continue litigating the main action in the District Court of Humacao with the resulting heavy outlay of money and waste of time, before its appeal could be decided by this court. The petitioner requested the issuance, in the alternative, of a writ of prohibition or of certiorari, and this court, after hearing the extensive arguments of the parties both by briefs and orally upon the propriety of each remedy, decided to issue a writ of prohibition, having first ordered a stay of the delivery of the properties pending a final determination of this proceeding, upon the furnishing of a bond which, under the special circumstances of the case, was fixed at $3,000, to answer the People of Puerto Rico in damages for any injury resulting from such stay if there was no right to the same, without prejudice at the proper time to increasing said bond, in a proper case, on motion of the People of Puerto Rico.

Having set forth the foregoing facts, we will now proceed to consider and decide the petition for a writ of prohibition.

 The first question to be determined refers to the capacity of the Governor, the Commissioner of the Interior, and the Attorney General of Puerto Rico to institute the present proceeding in the name of the People of Puerto Rico.

Before going into a consideration of the local statutes relating to the exercise of the power of eminent domain, it is well to establish certain general principles on the matter, which should not be overlooked in the construction of said statutes. One of such general principles is that which holds that the power of eminent domain resides in the state as an attribute of sovereignty, and that said power may only be exercised under a statute authorizing it and designating the officer or officers entitled to institute the proceeding in the name thereof. In this connection it was said in the case of *Matter of Poughkeepsie Bridge Co.,* 108 N. Y. 483, 490, cited by the petitioner:

"The power of eminent domain which resides in the State as an attribute of sovereignty, is nevertheless dormant until called into exercise by an act of the legislature. Until a statute authorizes an exercise of the power, it is latent and potential merely, and not active or efficient, and the State can neither exercise the prerogative, nor can it delegate its exercise, except through the medium of legislation. Therefore it is that wherever an attempt is made either by the officers of the State or by a corporation organized for a public purpose to take private property under the power of eminent domain, the officers or body claiming the right must be able to point to a statute conferring it."

To the same effect is the following excerpt from 29 C.J.S., "Eminent Domain," section 22:

"*The Statutory Authority.*—The right to exercise the power of eminent domain must be conferred by statute, either in express words or by necessary implication; and acts conferring it are to be strictly construed."

Apart from what we will say further on regarding the power of the Governor as a member of the Water Resources Authority, we know of no other statute conferring power on that officer to institute a condemnation proceeding. As regards the Attorney General, there is no law empowering him to bring such proceeding, unless it be in his capacity as counsel for the officers who might be legally authorized to

make the application. Therefore, it only remains for us to determine whether such power has been conferred on the Commissioner of the Interior.

Counsel for the People of Puerto Rico have invoked Joint Resolution No. 36, approved April 29, 1927 (Session Laws, p. 344), as the source of the power of the Commissioner of the Interior to institute the condemnation proceeding on behalf of the People of Puerto Rico. Said counsel admit that the said joint resolution was rendered void by virtue of our decision in *Valiente & Co.* v. *Treasurer,* 50 P.R.R. 563, which was affirmed in 93 F. (2d) 327, certiorari having been denied by the Supreme Court of the United States in 303 U. S. 662, and a petition for rehearing likewise denied in 304 U. S. 588. Counsel for the People of Puerto Rico maintain that, notwithstanding the annulment of Joint Resolution No. 36, the same was subsequently validated by Act No. 93 of May 6, 1938 (Session Laws, p. 210), and by the Act of Congress, approved June 16, 1938 (52 Stat. 708).

Let us assume, for the sake of argument, that the joint resolution was validated by Act No. 93 of May 6, 1938, and, if necessary, let us assume also that it was validated by the Act of the U. S. Congress, *supra.* Even then, we would be confronted with the fact that said resolution was substituted and, therefore, repealed by the Puerto Rico Water Resources Authority Act, approved May 2, 1941 (Session Laws, p. 684), which went into effect on July 31, 1941, and was, therefore, in force when the condemnation proceeding was instituted in the lower court on October 8, 1941. A slight comparison between the two enactments, that is, the Joint Resolution designated as "Act for the Development of the Water Resources" and the Puerto Rico Water Resources Authority Act, suffices to show that the latter repealed the former. Both pursue the same aim, clearly expressed in their respective titles, thus:

"Joint Resolution No. 36.

"Declaring that the development and operation by the People of Porto Rico of the available water power is a matter of public necessity and convenience as a measure for the protection and conservation of the natural resources of Porto Rico; levying on the assessed value of all the real and personal property of Porto Rico, not exempt from taxation, an annual and special tax of one-tenth of one per cent (1/10th of 1%) from July 1st, 1925, and for the fiscal years 1925–1926, 1926–1927, 1927–1928, 1928–1929 and 1929–1930, in addition to all other taxes levied under other laws in force, for the creation of a fund to be applied to the construction and, in part to the operation of works for the development of the said water resources; repealing Act No. 60, approved July 28th, 1925, and transferring to the special fund created by this Act, the balance available of the special tax accumulated in the special fund created by the said Act No. 60, approved July 28th, 1925, and for other purposes."

"Act No. 83.

"Creating the Puerto Rico Water Resources Authority; providing for its powers and duties; transferring to it all the properties, rights, duties, and obligations of the utilization of the water resources; authorizing it to acquire, construct, maintain, operate, improve, and extend revenue-producing undertakings to continue the development of the water resources of the Island; providing for the fixing and collecting of rates, fees, and other charges for the services of such undertakings and for the segregating or combining and the pledging, charging and otherwise encumbering of the revenues thereof; authorizing it to accept grants and loans from the United States or any agency or instrumentality thereof, to borrow money, and to issue negotiable bonds; providing for the payment of such bonds and for the rights of the holders thereof; authorizing the People of Puerto Rico to acquire real property for the authority; authorizing the municipalities and political subdivisions to grant and convey real property to the authority; declaring of public utility any works, projects and realties necessary for carrying out the purposes of this Act; prohibiting the granting of injunction preventing the enforceability of this Act, and for other purposes."

If we pass from the titles to the texts of both enactments, we will readily understand that the purpose of the latter act was to substitute as well as to revise and enlarge the former, and there is nothing to indicate that it was the intention of

the Legislature to keep in force the Act for the Development of the Water Resources. On the contrary, it is provided in the Water Resources Authority Act that all the properties, rights, duties, and obligations of the "Utilization of the Water Resources" shall be transferred to the Water Resources Authority. It is well to explain here that the phrase "utilization of the water resources" means, according to section 12 of the Act for the Development of the Water Resources, the several activities created thereunder.

That being so, and as the former law (Joint Resolution No. 36) has been substituted by the subsequent law (Act No. 83 of 1941), it is evident that the former ceased to exist and with it also ceased to exist any power granted to the Commissioner of the Interior by virtue thereof. See *Méndez* v. *Civil Service Commission*, 45 P.R.R. 108, where a similar question was discussed in connection with the Civil Service Act of 1931 (Session Laws, 534).

So that we must resort to the Water Resources Authority Act in order to determine whether under its provisions sufficient power is conferred on the Governor and the Commissioner of the Interior (inasmuch as the representation of the Attorney General is merely that of counsel) to institute condemnation proceedings.

Section 4(*a*) of the Water Resources Authority Act provides that the powers of the Authority shall be exercised by a directive body made up of the members of the Authority acting as a board which shall consist of the Governor as chairman and of the Commissioner of the Interior as vice chairman; and subdivision (*h*) of section 6 thereof, when defining the powers of the Authority, that is, the board, grants to it power "to acquire by purchase, lease, devise, gift, *or by the exercise of the power of eminent domain* in the manner provided by the laws of Puerto Rico, and to hold, maintain, and operate any undertaking or any part or parts thereof." Said subdivision (*h*) is connected with section 23

of the same act which, under the heading "Declaration of Public Utility," says:

"Section 23.—For the purposes of subdivision (*h*) of Section 6 hereof, and of this Act in general, all works, projects, realties and their accessories, which the Authority may deem necessary and convenient for carrying out the purposes expressed in ·this Act are hereby declared of public utility."

Under section 6, the Governor and the Commissioner of the Interior, as members of the board, are empowered to institute in that capacity condemnation proceedings in the name and on behalf of said Authority. In the proceeding brought in the lower court, however, said officers did not appear as such members of the Authority or on its behalf and, therefore, can not derive any power under section 6, *supra*. The proceeding herein was instituted by them in the name of the People of Puerto Rico and they appeared as officers of the People of Puerto Rico. Consequently, we have to look for their authority to section 13 of the said act which, under the caption "Acquisition of Lands by the People of Puerto Rico for the Authority," provides as follows:

"Section 13.—Upon application of the Authority, the Insular Government shall have power to acquire by purchase, or by condemnation in the manner provided by the condemnation laws, title in the name of the Authority, to any real property or interest therein, which may be needed or convenient on the purposes of the Authority, and payment for all such real property shall be made by the Authority. The power hereby conferred shall not limit or restrict the power of the Authority itself to acquire real property by purchase or condemnation."

The section above transcribed fails to indicate the officer who shall bring proceedings on behalf of the Insular Government, which is an indispensable requisite, as we have already seen, for vesting any officer or entity with power to bring the condemnation proceeding in the name of the state. See, in addition to the authorities already cited, the case of *U. S. v. 458.95 Acres of Land*, 22 F. Supp. 1017, 1019. This

being so, section 13, *supra*, does not vest them with such authority, and as the latter is not conferred by any other legal provision, we must conclude that neither the Governor nor the Commissioner of the Interior has the necessary legal capacity to institute, on behalf of The People of Puerto Rico, the aforesaid proceeding.

 Having determined the first question raised in the petition for the writ of prohibition in favor of the petitioner, we might close at this stage the present opinion and sustain the writ sought. However, as most of the other questions raised in the present case are of such public interest, we deem it our duty to consider them in order to dispel doubts and prevent litigations.

The second question to be determined, that is, whether the lower court should have admitted evidence upon the question of whether or not the transmission lines involved in the second cause of action were built and maintained under the terms of franchise No. 591, does not merit serious consideration. For the purpose of the petition for a writ of prohibition, we think that the facts alleged in the complaint in the condemnation proceeding must be assumed to be true; for otherwise we would be confusing the proceeding, since the petitioner would be entitled to demand, as a condition precedent to the issuance of the order for possession, the determination by the lower court of each averment of the complaint contested by the defendant. As very properly held by the lower court, such question must be considered and decided in the final judgment to be rendered.

We will take up now the third question raised by the petitioner; that is, the one which relates to the constitutionality of section 5A of the act to provide for the condemnation of private property, which literally transcribed reads as follows:

"In any proceeding which has been or may be instituted in the name and under the authority of The People of Puerto Rico for the acquisition of any property for public use, the petitioner or plaintiff

may file in the same cause, together with the petition or at any time before judgment is rendered, a declaration of taking for the acquisition and material delivery of the property the object of condemnation, signed by the person or entity empowered by law to seek the condemnation in question, declaring that said property is sought for the use of The People of Puerto Rico. Said declaration of taking and material delivery shall contain and shall be accompanied by: (1) A statement of the authority under which, and the public use for which, the acquisition of said property is sought; (2) a description of the property sufficient for the identification thereof; (3) A statement of the estate or interest in said property the acquisition of which is sought for public use; (4) A plan, in the case of property which can be so represented; (5) The fixing of the sum of money estimated by said acquiring authority to be just compensation for the property the acquisition of which is sought.

"As soon as said declaration of taking and delivery is filed and the deposit is made in the court, for the benefit and use of the natural or artificial person or persons entitled thereto, of the amount estimated as compensation and specified in said declaration, title to the said property in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in The People of Puerto Rico, and said property shall be deemed to be condemned and acquired for the use of The People of Puerto Rico, and the right to just compensation for the same shall vest in the person or persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been deposited and paid into the court. No sum so deposited and paid into the court shall be subject to any charge for commission, deposit, or custody.

"Upon the application of the parties in interest, the court may order that the money deposited in the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding. If the compensation finally awarded in respect to said property, or any part thereof, shall exceed the amount of the money so received by any entitled person, the court shall enter judgment against The People of Puerto Rico for the amount of the deficiency.

"Upon the filing of the declaration of taking, the court shall have power to fix the time within which, and the terms upon which, the natural or artificial person in possession of the property the object of the proceeding shall surrender material possession to the petitioner. The court shall have power to make such orders in respect to encumbrances and other charges, if any, burdening the property, as shall be just and equitable.

"*Provided*, That no appeal in any such cause nor any bond or undertaking given therein shall operate to prevent or delay the acquisition by, or the vesting of the title to such property in, The People of Puerto Rico, and its material delivery thereto." (Laws of 1941, p. 284.)

It is well to state here that section 5A above transcribed was amended by Act No. 22 of November 21, 1941 (Special Session Laws, p. 68), but said amendment does not affect at all the determination of the instant case, for it confined itself to extending the procedure prescribed in said section 5A to the Puerto Rico Housing Authority or to any municipal housing authority.

The constitutionality of the legal provision above transcribed is contested on two distinct grounds, to wit: (*a*) because the same authorizes the delivery of the property sought to be condemned by the People of Puerto Rico without first requiring full payment of a reasonable compensation to be determined by the court; and (2) because even supposing that such power might be conferred by the Legislature, the act is defective in that it failed to first make provision for funds sufficient to secure the payment to the owner of the property to be compensated for, should the court finally decide to grant compensation in a greater amount than that deposited by The People of Puerto Rico pursuant to the provisions of section 5A.

The provision of the Organic Act invoked by the petitioner is that part of Section 2 which reads as follows:

"Private property shall not be taken or damaged for public use *except upon payment of just compensation* ascertained in the manner provided by law." (Italics ours.)

The Spanish translation of the above provision of the Organic Act reads as follows:

"La propiedad particular no será tomada ni perjudicada para uso público, *a no ser mediante el pago de una justa compensación fijada* en la forma provista por ley." (Italics ours.)

Section 5A of our Eminent Domain Act is almost a literal copy of an Act of Congress (40 USCA, section 258-*a*) which has been attacked on the same grounds as ours is now, and its constitutionality has been upheld, among other cases, in *U. S.* v. *80 Acres of Land,* 26 F. Supp. 315, and in *Hessel* v. *A. Smith & Co.,* 15 F. Supp. 953, cited by counsel for the People of Puerto Rico.

In upholding the constitutionality of section 258-*a* of that act of Congress, it has been declared that the Fifth Amendment does not provide or require that the compensation should be paid prior to the occupation of the land to be taken, but the owner thereof is entitled to a reasonable, certain, and adequate provision of funds before he is deprived of it. *Cherokee Nation* v. *Southern Kansas R. Co.,* 135 U. S. 641, 659; *Bragg* v. *Weaver,* 251 U. S. 57, 62, and *Hurley* v. *Kincaid,* 285 U. S. 95.

In *Williams* v. *Parker,* 188 U. S. 491, 502, 503, the Supreme Court of the United States said:

"So far as the Federal Constitution is concerned, it is settled by repeated decisions that a State may authorize the taking of possession prior to any payment, or even final determination of the amount of compensation. (Citations.)

" ' . . . There can be no doubt that if adequate provision for compensation is made authority may be granted for taking possession pending inquiry as to the amount which must be paid and before any final determination thereof.' "

The petitioner, however, maintains that the federal decisions are not applicable to the case at bar, because the provision of our Organic Act is not the same as that of the Fifth Amendment to the Federal Constitution, and that the

phrase *"except upon payment of just compensation"* means that full payment of the compensation must be effected prior to, or at least simultaneously with, the transfer of the title and delivery of the property.

Before determining whether or not there is any substantial difference between the paragraph in question of Section 2 of the Organic Act and the corresponding provision of the Fifth Amendment, it seems advisable to state here the general rule prevailing in the United States concerning the payment of compensation in advance of the taking or occupation.

We copy from 29 C.J.S. "Eminent Domain," section 187:

"Sec. 187.—*Taking by United States, State or Municipal Corporation.* Generally prepayment is not required where the taking is by the United States, a state, or a municipal subdivision of the state, in the absence of constitutional or statutory provision so requiring; this rule apparently does not apply to the full extent in some jurisdictions, and constitutional or statutory provisions sometimes require prepayment, deposit, or the giving of security.

"While there is some authority apparently to the contrary, at least in regard to municipalities, the general rule is that in the absence of any constitutional requirement it is not ordinarily necessary for a state or municipal subdivision thereof to pay for property taken for public use in advance of the taking, if due provision is made for payment and for the means or methods by which the landowner may make his claim and receive compensation or damages; and, according to the view usually taken, a constitutional provision that private property shall not be taken for public use without just or reasonable compensation does not require that compensation shall actually be paid in advance of taking or occupation."

We have examined the various state constitutions and have observed that there is a division among the States as to the wording of the constitutional provision prohibiting the taking or damaging of private property for public use without a just and reasonable compensation. By far most of them follow the Federal Constitution which, as we have seen, does not require prepayment of said compensation.

The States which require that payment must first be made are, Louisiana, Minnesota, Mississippi, Montana, Ohio, Oregon, Georgia, Indiana, and California, whose constitution of 1849 followed the Federal Constitution until 1879, when it lined itself up with the states requiring prepayment.

From an examination of those constitutions it is noted that in all of them, without exception, the words ''first paid'' or ''first made'' are employed when referring to the compensation. So that they have taken good care to use an unequivocal and precise language which does not leave room for doubt as to the meaning of the constitutional provision; which shows that the phrase ''upon just compensation'' was but another way of expressing the same idea as that contained in the corresponding clause of the Federal Constitution, for otherwise, there would have been used a language as explicit and precise as was employed by the constitutions of the States already mentioned.

In the Philippine Organic Act of 1916, the Congress of the United States used exactly the language of the Fifth Amendment to the Federal Constitution, and it is inconceivable that in 1917, when enacting our Organic Act, the same Congress should have intended to establish any difference between the power granted to the Philippine Legislature and that conferred on our Legislature, especially if it is borne in mind that there was no reason for such discrimination, and that, as was held by the Supreme Court of the United States in the case of *Puerto Rico* v. *Shell Company,* 302 U. S. 253, 261:

''The grant of legislative power in respect of local matters, contained in section 32 of the Foraker Act and continued in force by section 37 of the Organic Act of 1917, is as broad and comprehensive as language could make it. . . .

''The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories.''

Is not the power to take private property for public use purely a matter of local concern which considerably affects the duty of the state to look after the protection and welfare of its citizens? The limitation which, according to petitioner, was imposed by the Congress of the United Sates in connection with the legislative power to take private property for public use would not be in harmony with the broad powers granted to our Legislature to legislate on local matters.

We repeat that if it had been the intention of the Congress to grant to the Legislature of Puerto Rico powers more restricted than those conferred on the Philippine Legislature, and to follow the example of the state constitutions which require prepayment, it would have used, as was done in said constitutions, a clear, definite, and unequivocal language to that effect and not such language as might lend itself to different interpretations.

Following the rule announced in 29 C.J.S. "Eminent Domain," section 187, *supra,* in the absence of a clear provision in our Organic Act or in any other act of the Congress so limiting the powers of our Legislature, we must hold that Puerto Rico, like most of the States, has the power to take, without having first to pay the compensation, the property thus condemned, upon compliance, of course, with the requisite of making provision for or securing the payment of the compensation when finally determined. This conclusion harmonizes with the modern tendency of the law to subject private property to the public welfare provided this can be done without substantial injury to the former. Such doctrine rests on the old maxim, *salus populi est suprema lex.*

We will take up now the last question raised, whereby it is claimed that the Eminent Domain Act is defective in that it fails to require as a condition precedent that sufficient funds be provided to secure the payment of compensation to the owner where the same is finally fixed by the court at a sum exceeding that deposited by the People of Puerto Rico pursuant to the provisions of section 5A, *supra.*

In 29 C.J.S. "Eminent Domain," section 187, p. 1079, the rule is stated thus:

*"Sufficiency of security or provision for payment.*—Where prepayment is not required, it is sufficient that an adequate and safe fund is provided from which payment is to be made, as, for instance, making the amount payable a charge on the public treasury either of the state or some municipal subdivision thereof, 'which is considered equivalent to actual compensation."

In the case of *State* v. *McCook,* (1929, Conn.), 64 A.L.R. 1453, the Legislature of Connecticut passed an act appropriating the sum of $35,000, or so much thereof as might be necessary for the taking by condemnation proceeding, or in some other way, of a certain parcel of land for building thereon a sanatorium for consumptives. The act was attacked as unconstitutional, it being alleged that sufficient funds had not been appropriated in case the court held that the value of the land taken was greater than the sum appropriated by the Legislature. In passing upon that question, after enunciating the fundamental principle that the statute authorizing the taking should appropriate funds for a fair compensation, either in the act or by some other means, the court said:

"In the act under which this proceeding was brought the sum of $35,000, or so much thereof as may be necessary, is appropriated. If just compensation for the land taken exceeds the amount appropriated, no means of meeting the excess is provided in the act or in the general law. This falls short of the indispensable requirement that the statute must conform to the constitutional requirement. Appealing to the known resources of the state does not provide the just compensation which the act must provide. Constitutional provisions must be followed; they cannot be ignored.

"In *Connecticut River R. Co.* v. *Franklin County,* 127 Mass. 50 at page 55, 34 Am. Rep. 338, the court said: 'It is sufficient that the statute which authorized the taking of the property should provide for the assessment of the damages in the ordinary manner, and direct, that the damages so assessed be paid out of the treasury of the commonwealth, and authorize the Governor to draw his warrant

therefor. . . . But in the statute before us there is no pledge of the faith and credit of the commonwealth, no appropriation of the general funds in its treasury, and no authority to the Governor to draw his warrant for the payment of the damages out of such funds. On the contrary, the very terms of the statute preclude the inference of any such pledge, appropriation, or authority, by directing that the land taken for the union passenger station shall be paid for from the earnings of the Troy & Greenfield Railroad and Hoosac Tunnel, and appropriating for the purposes of the act a sum not exceeding $9,000 to be paid out of those earnings. Stat. 1878, chap. 277, secs. 6, 8. The fact, admitted by the parties, that those earnings will probably be sufficient to meet and extinguish all claims for damages for lands so taken, falls short of satisfying the requirement of the Constitution that the owner of property taken for the use of the public shall have a prompt and certain compensation, without being subject to any risk or unreasonable delay.' ''

In order to secure adequate funds for the payment of the ultimate award to the owner of the property, the Congress provided (USCA, tit. 40, sec. 258 c) as follows:

"Action under section 258 a of this title irrevocably committing the United States to the payment of the ultimate award shall not be taken unless the chief of the executive department or agency or bureau of the Government empowered to acquire the land shall be of the opinion that the ultimate award probably will be within any limits prescribed by the Congress on the price to be paid."

Assuming that the above provision adequately secures the payment of the compensation, no such provision was included in the local statute, and it is evident that the statement contained in the complaint in the condemnation proceeding that, according to the representatives of the People of Puerto Rico, sufficient funds will be available for the payment of the ultimate compensation awarded, can not have any legal effect, for such assertion or statement is not sanctioned by law.

What assurance is provided by our Eminent Domain Act or by any other local statute to the effect that the compensation ultimately awarded shall be immediately paid to the

owner of the property taken? None at all, for in accordance with the Water Resources Authority Act, the Authority is empowered to borrow money for any of its corporate aims and to secure the payment of its bonds and "all other obligations by pledge of or lien on all or any of its contracts, revenues, and income *only."* (Italics ours.) However, it has been clearly and expressly declared by the lawmaker in the said Water Sources Authority Act that neither the People of Puerto Rico nor any of its political subdivisions shall be liable for the payment of the principal or interest on any bonds issued by the Authority. Section 6(*s*).

Nor is the omission in the statute supplied by the fact that Act No. 94 of 1938 (Session Laws, p. 211) provides for the form or manner of raising funds for the purchase of the Río Blanco Hydroelectric Plant, as such act only authorizes the purchase but not the condemnation thereof and, therefore, assuming that the funds mentioned in said act were sufficient to cover the compensation, they could not be applied to a taking for public use, for, as we have already stated, that act authorizes only the purchase, not the taking by condemnation. *State* v. *King County Superior Court (Wash.)* 124 P. 127; *Littleton* v. *Berlin Mills Co.* (N. H.) 58 A. 877; *Paris Mt. Water Co.* v. *Greenville,* (S. C.) 89 S. E. 669.

In these circumstances, it must necessarily be concluded that the statute does not comply with the constitutional requisite of adequately providing for the necessary fund to secure the payment of the compensation that might be ultimately awarded.

Therefore, the court was without jurisdiction to issue the order for possession in the instant case, since apart from the fact that, as we have seen, the Commissioner of the Interior lacks power to condemn the property in question, the statute has also failed to make the necessary provision for funds, and in such case, were we to uphold the order for

delivery we would be violating the constitutional guarantee against depriving a person of his property without due process of law, and also the very clause authorizing the taking by condemnation of private property for public use, since no compliance would be had with the requisite of adequate compensation.

For the foregoing reasons, the petition for a writ of prohibition must be granted.

Mr. Justice Snyder took no part in the decision of this case.

ON MOTION FOR REHEARING

April 10, 1942.

The respondents have filed a motion to reconsider our judgment of February 18th last as to the following particulars:

(1) Power of the Governor of Puerto Rico to institute condemnation proceedings in those cases where the statute does not specifically designate the officer who is to represent the People of Puerto Rico in said proceedings;

(2) Repealing effect of Act No. 83 of May 2, 1941, creating the Water Resources Authority; and

(3) Scope and extent of the power granted by Act No. 94 of May 6, 1938, by virtue of which the Commissioner of the Interior of Puerto Rico is authorized and ordered to take by purchase the properties of the Río Blanco Hydroelectric Plant, according to the terms of the franchise under which said properties have been constructed and are maintained.

Assuming that the said Water Resources Authority Act of May 2, 1941, had not wholly repealed Act No. 94 of May 6, 1938; and assuming, further, that both the Governor and the Commissioner of the Interior, the latter by virtue of said Act No. 94, *supra,* were empowered to institute the condemnation proceeding in the case at bar, and that the power to take by purchase implies that of taking by condemnation,

even then the result announced in our judgment, *supra,* would remain unchanged, for, as stated by us in the opinion on which that judgment is based, neither the Eminent Domain Act nor any other statute affords any guaranty that the compensation ultimately awarded will be immediately paid to the owner of the property taken. It could not be argued that the money appropriated by Act No. 94 of 1938 to purchase the franchise could be used for taking by condemnation, for said money was appropriated, as provided in section 1 of the 1938 act, *supra,* to acquire by purchase the Río Blanco Hydroelectric Plant *in accordance with the terms of the franchise* granted to the Porto Rico Railway, Light & Power Co. by the Public Service Commission of Puerto Rico on December 27, 1927, and approved by the Governor on January 4, 1928. This being so, said officer was empowered to acquire by purchase *under the terms and conditions of the franchise,* and, consequently, in no way could said money be applied to a taking by condemnation, for in the latter case the amount to be paid for the property would not be the price stipulated in the franchise but the market price to be ultimately determined by the court.

For the reasons stated, we think that it would be academic at this time to pass upon the questions raised by the respondents, which will be left open for consideration in some other case that may arise in the future.

The reconsideration sought must be denied.